|.ROBERT L. LOBRANO, Judge Pro Tern.
This is an appeal by the State of Louisiana, Department of Revenue and Taxation from the trial court’s affirmance of a judgment of the Board of Tax Appeals in favor of Falco Lime, Inc. and Shell Oil Company. For the following reasons we affirm.
Falco Lime, Inc. (Falco), on behalf of Shell Oil Company, applied for a refund of state sales tax paid in 1988. The subject sales tax was assessed on Falco’s sale of quicklime to Shell, for use in the transformation of dichlorohydrin (DCH) and trichloropropane (TCH) into the end product, epichlorohydirin (ECH), at Shell’s Norco plant. Falco claimed that the purchases of the quicklime were excluded from the sales tax under the Raw Materials Exclusion contained in LSA-R.S. 47:310(10)(c)(i). The Department of Revenue denied the refund claim, and Falco and Shell filed a petition before the Louisiana Board of Tax Appeals requesting review of the Department’s denial.
¡oOn November 5, 1997, the Board of Tax Appeals heard Falco’s and Shell’s case. The Board considered the testimony of expert witnesses and rendered judgment in favor of Falco and Shell, finding that the purchases of quicklime were excluded from the sales tax. The Department appealed to the 29th Judicial District Court, Parish of St. Charles. The matter was submitted to that court on briefs and oral argument. By judgment dated November 24, 1998, the trial court affirmed the Board’s decision. The Department of Revenue appeals that judgment to this court. We affirm.
Considerable latitude must be afforded administrative agencies to perform functions delegated to them under law. Holladay v. Louisiana State Bd. Of Medical Examiners, 96-1740 (La.App. 4 Cir. 2/19/97), 689 So.2d 718, 721. The standard of appellate review of. a decision of the Board of Tax Appeals is the manifest error standard. Judicial review of a decision of the Board is rendered upon the record as made up before the Board. A decision of the Board will not be reversed on appeal absent a finding that the Board 1) failed to correctly apply the law and adhere to procedural standards or 2) that the Board’s conclusions from the evidence presented were arbitrary or constituted an abuse of discretion. Ferrara v. Secretary, Dept. of Revenue and Taxation, State of La., 96-806 (La.App. 5 Cir. 1/28/97), 688 So.2d 147; Gisclair v. Bunge Carp., 95-391 (La.App. 5 Cir. 1/17/96), 668 So.2d 1179.
Louisiana law imposes a tax upon all sales at retail. LSA-R.S. 47:302(A) However, the “Raw Materials Exclusion” excludes from taxation the sale of materials used for further processing into articles of tangible personal property for sale at retail. LSA-R.S. 47:301(10)(c)(i). The Department defines the Raw Materials Exclusion in its regulation as follows:
|4Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the process activity will depend entirely upon an analysis of the end product. Although any particular material may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this pro *956 vision. The fact that a material remained as a recognizable component of the end product by accident because the cost of removal from the end product was prohibitive, or for any other reason, if it does not benefit the property by its presence, it was not materials for the processing and the sale is not exempt under this provision.
LAC 61:4301.10
The issue in the instant case is whether the Board was manifestly erroneous in its determination that the quicklime sold to Shell was a raw material not subject to the sales tax.
The test for determining whether a material is subject to the Raw Material Exclusion is whether the material was purchased for the purpose of “further processing into” the finished product, such that the material or any of its elements become a “recognizable, integral part” of the finished product. An integral part is one which is “essential to completeness: organically joined or linked.” Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1981); Traigle v. P.P.G. Industries, Inc., 332 So.2d 777, 781 (La.1976).
Shell presented the testimony of expert witnesses, Doctors Thummel and Johnson. Both testified that the oxygen from the quicklime was a recognizable, identifiable component of the final product produced, ECH. The experts further ^testified that the oxygen supplied by the lime was an essential component of ECH, and that the quicklime was intentionally purchased for the purpose of supplying the oxygen atom necessary for the conversion of TCP and DCH to ECH.
The Department urges this court to adopt the testimony of their expert witness, Dr. Groves, who told the Boapd that in the DCH pathway, the quicklime is only a processing chemical, and that only .5% of the final product contains oxygen derived from the quicklime. However, the Board chose to accept the opinions of Falco and Shell’s experts, which the trial court found to be reasonable and not clearly wrong. We agree with the trial court’s findings. Where two permissible views of the evidence exist, a fact finder’s decision to accept the opinion of one expert and to reject that of another can virtually never be manifestly erroneous. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Stevenson v. Louisiana Patient’s Compensation Fund, 97-709 (La.App. 5 Cir. 4/9/98), 710 So.2d 1178, 1181; Dragon v. Schultz, 97-664 (La.App. 5 Cir. 1/14/98), 707 So.2d 1274, 1276.
Relying on Tarver v. Ormet Corporation, 597 So.2d 1172 (La.App. 1 Cir. 1992), the Department further urges that the Board of Tax Appeals failed to recognize that there are substitutes for quicklime and thus the exclusion cannot apply. The Department argues that, in addition to 1) being an integral, identifiable, part of the end product and 2) being purchased for the specific purpose of processing into the end product, Ormet held that there must be no substitute for the raw material used before the exclusion is applicable. We disagree with the Department’s assessment of Ormet.
lfiIn Vulcan Foundry, Inc. v. McNamara, 414 So.2d at 1198, the Louisiana Supreme Court affirmed its prior holdings [1] that “[t]he proper inquiry ... is the purpose for which the [raw material] is bought.” The Vulcan court concluded that the raw material, coke, was purchased for the specific purpose of “utilization” as a heating fuel, and that the carbon in the end product was incidental. The court referenced the fact that substitute fuels could be utilized for heating purposes to produce the same end product, thus reinforcing their finding that the intended purpose of the coke was not to add carbon to the final product.
Even though the Omiet court reached the opposite result, it relied on the same *957 inquiry as the Vulcan decision, i.e., what was the intended purpose of the raw material? In concluding that the raw material was purchased for processing the end product, the Ormet court noted that, unlike Vulcan, there were no substitute raw materials that could be used. The Department contends that this reference to Vulcan created a “no substitute test” which must be satisfied before the exclusion is applicable.
Neither Vulcan nor Ormet created a “no substitute test.” The reference in Vulcan to other fuels, besides coke, was done in the context of explaining that the coke was purchased for heating purposes, and not to add carbon to the end product. The experts in Vulcan testified that substitute heating fuels could have been used. The Ormet decision merely notes that the oxygen supplied by the raw material [caustic soda], as an integral part of the end product, could not be derived from other materials. Simply, the court found that the sole purpose of using caustic soda was to add oxygen to the finished product. To the extent Ormet is interpreted to have created a “no substitute test,” that interpretation would be incorrect.
17There is sufficient evidence in the record to support a finding that the quicklime was intentionally purchased by Shell for the purpose of supplying the oxygen for the end product, ECH; that it was an identifiable component of the end product and that it benefitted the end product. For the above and foregoing reasons, we affirm the judgment of the district court.
AFFIRMED.

. Traigle v. P.P.G. Industries, 332 So.2d 777 (La. 1976).